# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-224-DLF** |
| **JONATHAN JOSEPH COPELAND,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jonathan Joseph Copeland to 108 months in custody, followed by three years of supervised release, $2,000 in restitution, and the mandatory assessment of $100 for each felony conviction. 108 months is the midpoint of Copeland's Guideline range of 97 to 121 months.

## I.    INTRODUCTION

Copeland participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Copeland was involved in some of the most violent altercations at the Capitol on January 6th. He was at the Peace Circle at 12:52 pm when rioters broke through the first unmanned barricade. Minutes later, he grabbed onto the second barricade after other rioters had lifted it up and pushed it into United States Capitol Police (USCP) officers. He walked over this second barricade and headed towards the West Front, where he and other rioters pushed a massive Trump billboard into the police line –assaulting the officers-- at around 1:40 pm. Copeland also participated in an assault on a journalist on the West Front. By 2:25 pm, Copeland entered the U.S. Capitol building through the Senate Wing Door, which had been breached by other rioters minutes before. Soon thereafter, he walked towards the Crypt, where he waved other rioters forward both in the Crypt and the Capitol Visitor Center.

For his actions on January 6th, the government recommends that the Court sentence Copeland to 108 months of incarceration.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Trial Brief filed in this case, ECF 58, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

//

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds***

Assaults against law enforcement on the West Front of the Capitol Grounds made possible the rioters' entry into the United States Capitol Building. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses, until the building itself was accessible and the occupants were at risk. The assaultive conduct on the grounds of the West Front led directly to the physical breaches of the building.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore

numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as on patrol throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway (inside the restricted perimeter). Seeing this, a half dozen USCP officers began to gather behind what is circled in red and marked as Area B on Government Exhibit 1. At 12:52 pm, several members of the crowd first breached the outer perimeter by jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.





*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top right), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:10 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were outflanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed

up onto scaffolding above and to the side of them, many of whom were hurling projectiles. While not all of the rioters surrounding the officers engaged in assaultive conduct, their presence made it difficult for officers to identify individual attackers and to defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

Defendant Jonathan Copeland was on U.S. Capitol grounds (both at the Peace Circle and the West Front) and then walking into the Capitol building during the time chronicled above.

**B.    Copeland's Role in the January 6, 2021 Attack on the Capitol**

Copeland attended a Trump rally on January 3 or 4, 2021 in Dalton Georgia, and then traveled from Georgia to Washington, D.C. He arrived in D.C. on the afternoon of January 5. That night, Copeland attended a Trump Rally at Freedom Plaza.



*Exhibit 5: Copeland[2] at a January 5th nighttime rally (Gov. Exh. 424 at 0:05)*

On the morning of January 6, Copeland attended the Trump rally at the Ellipse, wearing a dark, hooded sweatshirt with a yellow "Fuck Antifa" sticker on the left chest area, khaki pants, a plaid collared shirt, black boots, gloves, and safety goggles. Before Trump's speech ended, Copeland marched with others to the U.S. Capitol, ending up at the Peace Circle.

**Copeland's Conduct at the Peace Circle**

Copeland was within a few feet of the barricade when rioters breached the first (unmanned) barricade at the Peace Circle and walked onto Capitol grounds.

---

[2] Copeland is circled in yellow in all images in this Sentencing Memorandum.

9



*Exhibit 6: Copeland in the third row of people behind the first (unmanned) barricade with the USCP officers at the top of steps behind the second barricade (Gov. Exh. 401 at 00:02)*

Copeland followed closely behind other rioters as they breached an unmanned section of bike-rack fencing on the outer-edge of the restricted Capitol grounds.



*Exhibit 7: Copeland at the front of the crowd walking around the first unmanned barricade and towards the second manned barricade (Gov. Exh. 402 at 2:34)*

After this breach, Copeland moved through the crowd to get to the front of a line of rioters at the second barricade (identified as Area B on Government Exhibit 1) on Pennsylvania walkway, manned by several USCP officers protecting the U.S. Capitol complex. At approximately 12:53 p.m., rioters, Copeland included, pushed through the second bike rack barrier and police line in order to move closer to the Capitol building. Copeland pushed on the backs of other rioters, adding his strength to theirs, as the other rioters lifted and pushed the bike rack barriers into the police line.



*Exhibit 8: Copeland pushing on rioters' backs into the barricade and the USCP officers (Gov. Exh. 406 at 00:35)*

Then with arms outstretched, Copeland grabbed onto the bike racks and pulled on the barricade, as other rioters attacked the officers.



*Exhibit 9: Copeland with his hand (circled in red) on the barricade (Gov. Exh. 403B)*

Once the rioters pushed the second barricade down, Copeland and others ignored the USCP officers' attempts to put the barricade back up and their orders to "get back." Gov. Exh. 404 at 1:06 to 1:20. Instead, Copeland, stepped over the barricade and walked towards the Capitol building.



*Exhibit 10: Copeland walking over the second barricade towards the Capitol Building (Gov. Exh. 405 at 2:01)*

Copeland testified about these events at trial, but the Court did not credit his version of events:

> On cross-examination, Mr. Copeland suggested he was actually "moving out of the way." Day 3 transcript at 16. But this is plainly contradicted by Exhibit 403C at 0:05 to 0:06, showing Mr. Copeland pushing against other rioters' back[s] towards the police line. Even before Mr. Copeland came willingly to the second barricade from the Peace Circle, he had sufficient notice that the officers sought to keep rioters away from the Capitol grounds. Exhibit 405 at 0:29 to 0:30 shows Mr. Copeland walking around a metal barricade that has been knocked down at the first set of barricades, and he even helps up a person who has just tripped over the barricade.
>
> On cross-examination, Mr. Copeland said he did not remember seeing that first barricade and admitted that he did everything that he could to stay away from that police line. Day 3 transcript[3] at 12 through 14. That is simply not credible. As I've already explained, the videos plainly show Mr. Copeland voluntarily proceeding toward both barricades and attempting to get even closer to the second barricade, so he could push it toward the police line.

05/08/24 Tr. at 27-28.

### Conduct on the West Front

After the rioters—including Copeland—trampled over the barriers, they charged up the Pennsylvania walkway towards the West Plaza on the Capitol grounds. At approximately 1:40 p.m., Copeland participated in hoisting and pushing a large metal frame on wheels holding an oversized "TRUMP" billboard into a defensive line of MPD and USCP officers, who were attempting to prevent further advance by the rioters towards the Capitol building. Specifically, Copeland pushed his way through the crowd, placed one and then both hands on the sign, and used his body weight to push it into the line of officers for about 10 to 12 seconds.

---

[3] The Court heard evidence on three days: April 29, April 30 and May 1, 2024. In issuing its verdict from the bench, the Court cited the transcript from each day as Day 1, 2 and 3.



*Exhibit 11: Overhead view of Copeland pushing the Trump
sign into the police line (Gov. Exh. 414A)*

The Court found that "Mr. Copeland played an active role in the sign push. Mr. Copeland

can be seen on Exhibit 410 in his green bandana—see Stipulation 5—west of the police line.

Exhibit 410 also shows that he first grasped the arm of another rioter who was pushing the metal

frame sign towards the line of officers, and then Mr. Copeland grabbed the metal frame himself

and helped the other rioters push the sign into the line of officers. *See* Exhibit 410 at 26 through

39." 05/08/24 Tr. at 10.



*Exhibit 12: Copeland using both hands to push the*
*Trump billboard into the police (Gov. Exh. 410A)*

According to MPD Officer Sarah Beaver, the Trump billboard was a metal frame with hard 90-degree angles and wheels "as big as your face or a little bigger."[4] The rioters pushed the sign on its side, so that the heavy metal frame and wheels were facing the police line. Initially, the sign

---

[4] The Court expressly found that the billboard was a deadly or dangerous weapon. "Officer Beaver's testimony and the video evidence of the sign push leaves no reasonable doubt that the metal frame sign is a deadly or dangerous weapon. She testified that the very large Trump sign had a metal frame with hard 90-degree angles and wheels as big as your face or a little bit big other. The rioters pushed the sign on its side so that the heavy metal frame and wheels were facing the police line. In Officer Beaver's perspective, the wheels appeared to be crushing, as evidenced by a gentleman falling to the ground after coming into contact with them. All of these facts come from day 2 transcript, the latest at 22. Exhibits 303, 301, and 412 corroborate Officer Beaver's description. They show the sign had sharp metal edges, a large wheel about the size of a head, and a sharp underbelly. Further, Exhibit 303 at 49 to 122 shows that the bottom of the sign had elongated metal edges. Exhibit 308 at 120 to 126 also shows that the sign's metal frame, whether it was aluminum or something else, was sufficiently hard and sturdy to withstand the enormous force applied by the large number of rioters who were on one sign forcefully pushing the sign against a large number of police officers on the other side. At no time during the stand-off did the metal frame buckle." 05/08/24 Tr. at 18-19.

was moving toward Constitution Avenue, but then the rioters turned the sign towards the police line. Videos reflected that the sign hit some of the rioters.



*Exhibit 13: Rioters (in the blue square) hit by the wheel of the billboard (Gov. Exh. 301 at 00:40)*

Another body worn camera video reflected an officer getting pinned by the sign.



*Exhibit 14: Officer using his blue-gloved hand to try to lift the billboard's metal bar and strap off another officer's back (Gov. Exh. 306 at 1:20)*

Officer Beaver testified that she thought the sign was going to hit her neck, chin and head. Given the sign's physical attributes, Officer Beaver did not want it to hit her or anybody else or to collapse on anybody, including the rioters. At one point, as the sign moved towards the officers, its wheels got caught in between the bars of the bike-rack barricade in front of the police line.

17



*Exhibit 15: Billboard wheel stuck in the barricade (Gov. Exh. 301 at 00:55)*

This concerned Officer Beaver, because it could have lifted the fencing up and thrown the fencing into the police. She used her baton to try to push the sign backwards, but given its weight and force, her baton slid up the metal frame. Officers ultimately pushed the wheel back out of the fence and then tried to lift it up over the fence in order to take the billboard away from the crowd. While the officers were distracted by the sign, several rioters pulled away bike racks from the police line, making the outnumbered officers more vulnerable to the crowd.

18



*Exhibit 16: Rioters removing the bike racks as the officers*
*were distracted by the Trump billboard (Gov. Exh, 301 at 1:07)*

At trial, the Court found that, "Copeland testified that he knew that the sign wasn't supposed to be there and that he and a few others were saying 'get it out, get it out.' Day 2 transcript at 210. Mr. Copeland also suggested in his testimony that he helped get the sign out to a clear area and that he had no intention of assaulting or interfering with officers." 05/08/24 Tr. at 13. The Court did not find this testimony credible.

To start, Mr. Copeland's testimony was inconsistent. On direct examination, Mr. Copeland testified that he knew the police were over there because he had obviously seen them. That's transcript at 212. But at another point on direct examination, he testified that he saw nothing in front of him and only now knows there were police officers, at least 40 of them, on the other side of the sign. Again, transcript at 212. On cross-examination, however, Mr. Copeland again stated that he was pushing the sign out of the area 'because at the time, I couldn't see any police.' Day 3 Transcript at 43.

But as the government pointed out at trial, Mr. Copeland had been on the West Front for over an hour where there was a heavy police presence. And when the government pushed Mr. Copeland on this point, he finally conceded that he in fact knew he was pushing the sign at the police. Day 3 Transcript at 44.

Further, Exhibit 410 plainly contradicts Mr. Copeland's later testimony that he was doing -- that all he was doing that day was helping the police get the sign out. Day 3 transcript at 46. Exhibit 410 at 40 shows Mr. Copeland running away from the sign when it was still suspended over the heads of the officers and rioters while officers were struggling to take control of the sign and avoid injuries.

Far from acting to ensure that the sign posed no further threat to the safety of others, including the police officers, Mr. Copeland scampered away, and he did so even though he had pushed forward, overrunning barriers and officers at every turn that day, at the Peace Circle, at the West Front, and later inside the Capitol.

05/08/24 Tr. at 13-15. The Court later elaborated:

As the Court has stated, it does not credit Mr. Copeland's testimony that he was simply trying to move the sign out of harm's way. His shouting, waving of his arm, movement toward the sign, and ultimate forceable pushing of the sign instead reflect an intent to join the crowd and use the metal frame sign as a battering ram to push forward through the police line.

05/08/24 Tr. at 22.

While still on the West Front, Copeland and other rioters began to argue with a photographer in the crowd. Copeland yelled at the photographer and grabbed at him, as a group of rioters attacked the photographer and pushed him off a ledge.



*Exhibit 17: Copeland yelling and gesticulating at the photographer*
*in the black helmet whose hands are up (Gov. Exh. 419A at 00:40)*

The Court found that Copeland's mistreatment of the photographer was informative as to

his intent at that time, and that his testimony on this issue was "not credible at all."

> [T]he Court's finding that the defendant engaged in physical violence is strengthened by
> the assault of a reporter on the West Front of the Capitol. Exhibit 419A starting around
> 0:20 shows a group of rioters pushing around a reporter as they yelled "get out of here."
> Mr. Copeland appears at 0:32 and is then seen pushing the reporter several times in Exhibit
> 419A. He then yells at the journalist "get out of here" and points away from the Capitol
> Building. He then shouts again "go" as other rioters are seen pushing the reporter off a
> ledge.
>
> Mr. Copeland testified that he intervened to, "make sure the journalist was okay." That's
> day 3 transcript at 87. But this testimony was not credible at all. The video plainly shows
> Mr. Copeland shoving the reporter and angrily shouting at the reporter to get out and go.
> Mr. Copeland's yelling and shoving and encouragement of other rioters pushing the
> reporter off the ledge together constitute direct infliction or threat of infliction of bodily
> harm.

05/08/24 Tr. at 44-45.

### Conduct Inside the U.S. Capitol Building

As discussed above, rioters began to enter the Capitol building from the West Front at

around 2:13 pm, and officers had largely retreated from the West Front by 2:28 pm. While rioters

were overrunning officers on the West Front, Copeland entered the U.S. Capitol Building through

the Senate Wing Door at approximately 2:25 pm, after changing the green bandana on his head to

a red hat.



*Exhibit 18: Copeland entering the U.S. Capitol building (Gov. Exh. 502 at 00:08)*

Government Exhibit 502A tracks Copeland's movements inside the Capitol building. It reflects that he entered the building through the Senate Wing Door, walked into the Crypt, entered the Capitol Visitor Center, went down escalators, and proceeded down a hallway not far from where the House of Representatives was meeting.

At various points inside the building, Copeland waved other rioters to follow him.



*Exhibits 19(a), (b) and (c): Copeland waving the rioters forward (a) at the Crypt, (b) at the bottom of the stairs at the Visitors' Center, and (c) beneath the skylights in the hallway at the Visitors' Center (Gov. Exhs. 502 at 00:43, 04:19 and 08:45)*

The Court found that his waving constituted expressive conduct for purposes of the parading and picketing element of the offense, since Copeland's waving was meant to attract the notice of other rioters to lead them further into the Capitol building. 05/08/24 Tr. at 46.

### Copeland's Statements About January 6th

Copeland expressed no remorse for his participation in the riot. Instead, he complained about the treatment of rioters and blamed the events of that day on "police brutality."



Similarly, when a U.S. Representative extolled the greatness of the United States, Copeland responded by criticizing the Representative for not helping Ohioans (like him) who "risked everything to speak up on the 2020 election fraud on J6th[.]"



24

When FBI agents interviewed Copeland on February 5, 2021, he admitted attending the Trump rally, and then heading to the Capitol, but he told the agents that the police were the aggressors. Copeland said that he arrived at the first line of officers at the bike rack barrier, and the cops charged towards the crowd and started hitting people. Once arrived at the West Front, Copeland described the scene as a "big show," including Antifa agitators. Copeland said he joined a line to walk into the Capitol Building, wandered through the building, and was then directed out of a broken window by an officer. Copeland made no mention of walking over barrier after barrier, pushing the barricade at the Peace Circle, pushing the Trump billboard into the police line, scuffling with a photographer at the West Front, or waving rioters forward once inside the building.

Finally, Copeland conceded at trial that he deleted all of his social media accounts after January 6th. 05/01/24 Tr. at 75 ("Q. So based on that conclusion, you deleted all your stuff; right? A. No, not based off that, not based off January 6. The reason I deleted everything was because of January 6, as in the politics behind it, because it was so polarizing and so much infighting and so much just division. It was disgusting. Q. Sure. But you would agree with me that soon after you left January 6, you deleted all your social media; right? A. Yeah. I got off Facebook, Snapchat, Twitter. I believe that was it. Q. And your Yahoo! e-mail; right? A. I started a new -- I started a Gmail."). Copeland also conceded that by February 2021, he also had a new phone, though he argued that he switched phones all the time. 05/01/24 Tr. at 77.

## III.    THE CHARGES AND TRIAL

On July 12, 2023, a federal grand jury returned an indictment charging Copeland with nine counts:

**Conduct at the Peace Circle:**

- Count One: Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

**Conduct on the West Front:**

- Count Two: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b);

- Count Three: Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Four: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

- Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

- Count Six: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

- Count Eight: Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. § 5104(e)(2)(F); and

**Conduct inside the U.S. Capitol Building:**

- Count Seven: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);

- Count Nine: Parading, Demonstrating or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

On, May 8, 2024, Copeland was convicted of all of these offenses, except for Count Seven, following a bench trial.

## IV. STATUTORY PENALTIES

Copeland now faces sentencing on the above counts of conviction. As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces:

Counts 1 and 3: Civil Disorder
                    18 U.S.C. § 231(a)(3)
                    5 years imprisonment/$250,000 fine

Count 2:      Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon
            18 U.S.C. §§ 111(a)(1) and (b)
            20 years imprisonment/$250,000 fine

Count 4:      Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon
            18 U.S.C. §§ 1752(a)(1) and (b)(1)(A)
            10 years imprisonment/$250,000 fine

Count 5:      Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon
            18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)
            10 years imprisonment/$250,000 fine

Count 6:      Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon
            18 U.S.C. §§ 1752(a)(4) and (b)(1)(A)
            10 years imprisonment/$250,000 fine

Count 8:      Act of Physical Violence in the Capitol Grounds or Buildings
            40 U.S.C. § 5104(e)(2)(F)
            6 months imprisonment/$5,000 fine

Count 9:      Parading, Demonstrating, or Picketing in a Capitol Building
            40 U.S.C. § 5104(e)(2)(G)
             6 months imprisonment/$5,000 fine

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The United States Probation Office determined that Copeland's total offense level is thirty

(30) and his Criminal History Category is I. PSR ¶ 72. The Government agrees with the USPO's

calculation. Accordingly, Copeland's Guidelines range is 97-121 months' imprisonment.

The Government further agrees with the USPO that the Guideline Calculations are as

follows:

<u>Counts One and Three: 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | <u>+2</u> |
| | **Total** | **26** |

<u>Count Two: 18 U.S.C. § 111(b)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |

---

[5] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used. U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." The cross-reference in U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt., n.1. Here, the conduct includes the felonious (punishable by up to 20 years' incarceration pursuant to 18 U.S.C. § 111(b)) assault on officers at the West Front, which involved a dangerous weapon with intent to cause bodily injury (here, a billboard); and an intent to commit another felony aside from the assault (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

[6] As discussed above, the cross-reference from U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault and the assault on the officers here qualifies as aggravated assault. *See also United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where defendant acted "with intent to commit civil disorder under Section 231(a)(3).").

| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **28** |

Count Four: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Count Five: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Count Six: 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Because Count 8 and 9 are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Under U.S.S.G. §3D1.2, "closely related counts" group. Copeland's eight counts of conviction form two groups:

Group One consists solely of Count One. Count One forms a separate group from the rest, because Count One involves a different victim (USCP at Peace Circle) and a different time and place (Breaching police barricade at Peace Circle). The offense level for Group One is **26**.

29

Group Two consists of Counts Two and Three, because they involve a separate victim—Police Officers at the West Front—and similar acts "connected by a common criminal objective" of assaulting and obstructing officers on the West Front. U.S.S.G. § 3D1.2(b). Counts Four, Five and Six involve a different victim, Congress, but because the offense levels for these counts are enhanced by the specific offense characteristic relating to the same dangerous weapon, they group with Counts Two and Three pursuant to U.S.S.G. § 3D1.2(c). The highest offense level for this group is **28.**

Counts Eight and Nine are not grouped, because the Guidelines do not apply to them.

Group Two has the highest offense level, 28, and is assigned one unit. Group One is within two levels of Group Two, so it is assigned one unit. Two units result in a two-level increase, U.S.S.G. § 3D1.4, and a Combined Offense Level of **30.**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who also meet certain additional criteria. This guideline is inapplicable to Copeland, who has a total criminal history score of one. PSR ¶72. Furthermore, application of Section 4C1.1 requires that "(3) the defendant did not use violence or credible threats of violence in connection with the offense" and "(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induced another participant to do so) in connection with the offense." Here, Copeland repeatedly used violence and the credible threat of violence. when he (1) assisted in shoving a barricade into USCP officers at the Peace Circle, (2) shoved a billboard into the police line at the West Front, (3)

engaged in an altercation with a reporter at the West Front, and (4) when he waved rioters into the Capitol building. Further, Copeland "possessed" and "transported" a dangerous weapon in connection with the offense when he assaulted police officers by pushing the billboard battering ram into the police line.

The U.S. Probation Office calculated Copeland's criminal history as category I, which is not disputed. PSR ¶ 72. Accordingly, the Government and the PSR writer calculate that Copeland's total adjusted offense level is 30, and his Guidelines imprisonment range is 97 to 121 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Copeland's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Copeland attended a Trump rally on January 5, and again on the morning of January 6. Copeland left the rally to march with others to the U.S. Capitol. Copeland participated in the rioters' first breach of the restricted perimeter on Capitol Grounds at 12:53 pm. He walked around the first unmanned barricade after a section of it had been pulled open by another rioter. Copeland then pushed on the backs of rioters while those rioters lifted and pushed the second bike-rack barricade into USCP officers guarding the Capitol grounds at Pennsylvania Walkway. After that barricade went down, Copeland continued towards the Capitol building. Once

31

arrived on the West Front, he reengaged with the police. At approximately 1:40 pm, he used a massive Trump sign to assault police officers defending the Capitol. While at the West Front, Copeland also participated in the assault on a photographer.

Copeland then made his way to the Upper West Terrace and entered the Capitol building through the Senate Wing Door at approximately 2:25 pm, leaving 20 minutes later. While inside the building, Copeland was present as rioters stormed through the Crypt and chased officers into the Capitol Visitor Center. While inside, he continually waved other rioters forward into the building. Copeland only left once USCP Officers started arresting rioters inside the Crypt. The nature and circumstances of Copeland's offenses warrant the government's recommended sentence of 108 months.

**B. The History and Characteristics of the Defendant**

Copeland dropped out of high school but obtained his GED in 2012. He subsequently attended the University of Northern Ohio for one semester. Copeland reported that he was employed at the time of his arrest, PSR ¶108, and has worked in construction and food prep. Most recently, he attempted to start up a concrete and excavation company. Copeland has one misdemeanor assault conviction from 2013, where he broke a screen, came through a window and assaulted the victim, and then walked outside and slammed his hand into the victim's car windshield, breaking it. Nothing in Copeland's history warrants mitigation.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Copeland's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Copeland has expressed neither remorse nor contrition. Amazingly, both in his posts on X, and his statements to the FBI in February 2021, he blamed the police for the violence on January 6th. At trial, Copeland again took no responsibility for his actions – at the Peace Circle, he blamed "10 to 20 people at the front line" and said that they "caused complete chaos and dragged all of us in it, involving myself. So the intentions weren't exactly there. It was just chaos." 04/30 Tr. at 206.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

He blamed others for pushing him into the barricade. *Id.* at 207-208. He told his lawyer that he knew, "this was the spot that nobody was supposed to pass, as in I'm not leaving or going beyond this point, this designated area with the signs on it, that I am not going past that, so why are these people doing that, and there's just nothing I could do to contain anything whatsoever." *Id.* at 209. Once arrived at the West Front, however, he asserted that he thought that he could be there. *Id.* at 210. He asserted that he just stood back and watched, *id.* at 211, and, when he could, he tried to help the police by pushing the billboard at them.

Copeland also testified that he tried to help the cameraman by breaking up a fight between the rioters and the cameraman: "There's two humans were aggressively pushing around a man, and in my heart, I knew it was wrong. So what I did was aggressively get in the middle of these three people, and I believe in my heart I'm the reason why it got split up. That man was tooken out of danger. In my heart, I believe so, and I believe I had something to do with that. That's it." *Id*. at 212-213. Although Copeland conceded that it appeared that he had shoved the cameraman, he said that he did it to get the cameraman to a place of safety. 05/01/24 Tr. at 36-37. When asked, "At this point, he's [the cameraman is] flat on his back surrounded by Trump supporters, and you knew he was safe?" Copeland insisted, "Yeah, because Trump supporters don't attack people," *id.* at 38, despite having watched multiple Trump supporters assault the cameraman and shove him over a ledge. And , more broadly, having watched Trump supporters repeatedly and violently assault wave upon wave of police officers.

At trial, Copeland continued to claim that the riot was the police officers' fault. 04/30 Tr. at 212 ("I feel like they aggressed the crowd and maybe even caused a riot, and that's what I

personally believe is what happened."). *See also id*. at 222 ("The police retreated. After they pissed everybody off, shot everybody, threw all the bear mace into the crowd, just hit everybody, bear sprayed everybody...."), 05/01/24 Tr. at 31 ("It was very clear that they [the police] were attacking a large group of people ... and caused a riot.").[8]  Copeland also asserted that no one ever told him to leave, on the Grounds or inside the Capitol building. *Id.* at 225 ("There was nobody telling me I had to leave from the beginning to the end, not one person, not one complete officer, not one commandment, not one loud speaker, nothing, not one warning, zero.")

Even after his trial and conviction for felonious assault with a dangerous weapon, the only acknowledgment of any criminal conduct on January 6 the defendant could manage was a conditional and self-justifying apology through counsel that he "apologized if he violated any laws. His intent on January 6th was to be peaceful." PSR ¶ 34. Having lived through January 6th, and then reliving it at trial, Copeland remains unwilling to express any remorse or accept any responsibility for his conduct. Put bluntly, Copeland was and is in complete denial of his role in the events of January 6th and does not recognize that he did anything wrong. A guidelines sentence of 108 months is both warranted and necessary to deter Copeland from such conduct in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[8] Oddly, when asked about his feelings on the police, Copeland responded: "I love them. I support the blue." 04/30/24 Tr. at 232. And talking about the police on January 6th, Copeland said, "I didn't think they deserved anything, any of that. Anything that happened that day, they didn't deserve." *Id*.

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. We do so here.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of

weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Sean McHugh*, 21-cr-453 (JDB), the Defendant was a construction worker and electrician who owned his own business and financially supported his family before he was arrested for his actions on January 6, 2021. He urged people to fight and storm Congress, and came to the Capitol armed with a cannister of bear spray. McHugh was at the initial breach at the Peace Circle, wrestled with an officer for control of a barricade, assaulted officers with his bear spray, spewed vitriol at the officers over a megaphone, and shoved the Trump sign at the police line. On April 17, 2023, Judge Bates presided over a stipulated trial and found McHugh guilty of §§ 111(b) and 1512. Unlike Copeland, McHugh was in criminal history category IV. His Guideline range was 110 to 137 months. The government recommended a sentence of 123 months. McHugh argued in his sentencing memorandum that he was swept up in the mob mentality, had been awake over 48 hours, became upset when he saw his mother get hit by a rubber bullet, and was incarcerated through the COVID pandemic. Judge Bates varied downwards and sentenced McHugh to 78 months, a sentence in line with "cases involving defendants with similar records who have been found guilty of similar conduct." Tr. at 50. Here, although Copeland is in criminal history category I, Copeland also has none of McHugh's equities. Copeland does not run a business, does not support a family, did not see his mother get hit with a rubber bullet, has not taken responsibility, and was not incarcerated through COVID.

In *United States v. Craig Bingert,* 21-cr-91 (RCL), the defendant was found guilty after a bench trial of several counts including 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1512(c)(2), and 18 U.S.C. § 231(a)(3). Bingert, along with others, charged up the stairs on the West front of the Capitol as the officers retreated. Once the defendant reached the top, he chanted "let us in!" with other rioters. After spending several minutes near the police line and filming another rioter spray the officers with a fire extinguisher, Bingert joined with others to forcibly push bike racks into the line of police officers for at least 15 seconds. One of the officers was struck in the leg causing pain. The defendant remained on the Upper West Terrace for hours watching the violence in the Lower West Terrace tunnel and had to be forced off the terrace by police. Judge Lamberth sentenced the defendant to 96 months of incarceration.[11] Bingert did not, however, engage in multiple acts of violence that day, over the course of hours. Copeland, on the other hand, aggressed at least three different groups of people and officers, and lied about it - in a variety of ways. He sets himself apart, and thus, is deserving of a higher Guidelines punishment.

**VII.    RESTITUTION**

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

---

[11] The government is aware that this Court sentenced Defendant Edward Rodriguez to 36 months for violating 18 U.S.C. § 111(b). *United States v. Edward Rodriguez,* 21-cr-483 (DLF). Rodriguez is distinguishable from Copeland. Rodriguez was involved in only one event, spraying bear spray directly at police officers, eight of whom suffered injuries from being sprayed. He had a significant number of equities. And Rodriguez quickly took responsibility for his action, showed remorse, and pled guilty. Conversely, Copeland has been implicated in multiple criminal events, assaulting multiple different officers and a cameraman, and entering the Capitol building. Furthermore, Copeland has listed no equities, went to trial, testified falsely, and, as yet, has taken no responsibility for his actions.

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Copeland was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar

covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay. [12]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Copeland to pay $2,000 in restitution for his convictions on Counts 1 through 6 , 8 and 9. This amount fairly reflects Copeland's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. Sections 111b, 231 and 1752 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 108 months in custody, followed by three years of supervised release, $2,000 in restitution, and the mandatory assessment of $100 for each felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    *s/ Alexandra F. Foster*
ALEXANDRA F. FOSTER, Detailee
D.C. Bar No. 470096
KYLE R. MIRABELLI
N.Y. Bar No. 5663166
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
Alexandra.Foster@usdoj.gov
(619) 546 6735